**2019 UT App 134**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF L.L.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

GUARDIAN AD LITEM,
Appellant,
*v.*
STATE OF UTAH, B.W., S.L., AND
UTE MOUNTAIN UTE TRIBE,
Appellees.

Opinion
No. 20170659-CA
Filed August 1, 2019

Eighth District Juvenile Court, Vernal Department
The Honorable Ryan B. Evershed
No. 1128314

Martha Pierce, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee State of Utah

Emily Adams and April Erin Bradley, Attorneys
for Appellee B.W.

Jeffry K. Ross, Attorney for Appellee S.L.

Mark A. Flores, Attorney for Appellee
Ute Mountain Ute Tribe

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Federal law requires that before a court can remove an
Indian child from a parent's custody, a "qualified expert

witness" must provide evidence that the "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e) (2012). The questions presented for our determination are what constitutes a "qualified expert witness" and whether a Utah court must apply the definition of that term provided by a federal agency. Specifically, the attorney guardian ad litem (the GAL) for an Indian child (Child) appeals the juvenile court's order denying the GAL's motion to transfer custody of Child and the court's order terminating jurisdiction over Child's status. The GAL contends that the juvenile court erred when it refused to consider certain of the GAL's witnesses as "qualified expert witnesses" pursuant to the Indian Child Welfare Act (ICWA). *See id.* The GAL faults the juvenile court for deferring to the United States Department of the Interior, Bureau of Indian Affairs' (the BIA) regulation interpreting the statutory term rather than employing its own interpretation. The GAL also argues that the juvenile court erred when it excluded certain expert witness testimony as privileged.

¶2    We conclude that while the juvenile court correctly looked to the BIA regulation to determine whether the GAL's witnesses were qualified expert witnesses pursuant to ICWA, the juvenile court misapplied the regulation and exceeded its discretion in excluding the GAL's witnesses and terminating jurisdiction over Child and her mother (Mother). We also conclude that the juvenile court erred in determining that the testimony of two of the GAL's witnesses was subject to therapist–patient privilege. We therefore reverse and remand for further proceedings.

BACKGROUND

¶3    Child is a three-year-old girl born in April 2016. She is an Indian child as defined by ICWA because she is eligible for

membership in the Ute Mountain Ute Tribe (the Tribe) and her biological parents are members of the Tribe.[1] *See* 25 U.S.C. § 1903(4) (2012). Child came into the custody of the Utah Division of Child and Family Services (DCFS) as a newborn because of Mother's issues with alcohol and domestic violence. Mother has three older children whom the court also adjudicated as abused and neglected and who were removed from Mother's care before Child was born. In November 2016, the juvenile court returned Child to Mother's custody, with DCFS providing in-home protective services to Mother and Child.

¶4 Shortly thereafter, the juvenile court received letters from three therapists who had been involved with Mother and her children. The letters expressed the therapists' concerns about Mother's ability to safely parent Child. Consequently, in March 2017, the GAL moved to remove Child from Mother and return her to DCFS custody. In the motion, the GAL asserted that Mother continued to struggle with domestic violence issues and explained that all three therapists who had submitted letters to the court had concerns about Mother's ability to parent Child safely because of Mother's continued relationship with Child's father, who had been convicted of abusing Mother's older children. The GAL noted that DCFS was in the process of terminating reunification services for Mother and her three older children and considering changing their permanency goal to adoption, and asked the juvenile court to remove or transfer custody of Child because she was a sibling-at-risk.

¶5 The juvenile court set an evidentiary hearing on the GAL's motion for June 27, 2017. In preparation for that hearing, the GAL designated as expert witnesses the three therapists who

---

1. The Tribe intervened in the case in February 2017.

had previously submitted letters to the court. Prior to the hearing, Mother and the Tribe moved to strike the GAL's motion to transfer custody, arguing that the GAL had failed to designate an expert witness who was qualified as required by ICWA and the BIA regulations; specifically, the GAL had failed to designate an expert who could testify about the prevailing social and cultural standards of the Tribe as required by the BIA regulations. 25 C.F.R. § 23.122(a) (2016). Mother and the Tribe also objected to the testimony of two of the therapists on the ground that Mother's therapist–patient privilege rendered their testimony inadmissible.

¶6    The GAL argued that since ICWA does not explicitly define what qualifies a witness as an expert, the juvenile court had "discretion to determine whether a witness has adequate qualifications to provide the proffered testimony." Although the three therapists were not qualified to testify regarding tribal cultural standards, the GAL asserted that the court was not bound by the BIA regulations and urged the court to qualify the therapists as expert witnesses anyway based on their qualification "to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child," 25 U.S.C. § 1912(e) (2012).

¶7    Following a hearing on the matter, the juvenile court agreed with Mother and the Tribe that because "qualified expert witness" is not defined by ICWA, the court should defer to and adopt the BIA's interpretation of that term pursuant to the *Chevron* deference rule articulated by the United States Supreme Court, which requires courts to defer to federal agencies' interpretations of federal statutes under certain circumstances. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–45 (1984). Accordingly, the juvenile court determined that the standard set forth in the BIA regulation precluded the court from qualifying any of the therapists as experts because

none of them were qualified to testify about the prevailing social and cultural standards of the Tribe. Based on this determination, the juvenile court dismissed the GAL's motion to remove Child from Mother's custody. The court closed Child's case and terminated jurisdiction on August 3, 2017, and the GAL timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶8     The GAL asserts that the juvenile court erred in determining that the three therapists the GAL intended to call to support the motion to remove were not qualified expert witnesses because they could not testify regarding the Tribe's social and cultural standards. The qualification of witnesses as experts is generally a discretionary decision for a trial court. *See State v. Holm*, 2006 UT 31, ¶ 89, 137 P.3d 726. But to properly exercise that discretion in an ICWA proceeding, the court must apply the correct legal standard. *See Ross v. Epic Eng'g, PC*, 2013 UT App 136, ¶ 11, 307 P.3d 576; *see also In re M.F.*, 225 P.3d 1177, 1183 (Kan. 2010) (explaining that in a child welfare case involving an Indian child, the legal standard for qualified expert witnesses is defined by ICWA). The juvenile court's interpretation of ICWA's requirements regarding qualified expert testimony presents a pure question of law to be reviewed de novo. *See In re adoption of B.B.*, 2017 UT 59, ¶ 16, 417 P.3d 1.

¶9     The GAL further asserts that the juvenile court erred in determining that the therapists' testimonies were subject to the therapist–patient privilege. "The existence of a privilege is a question of law for the court, which we review for correctness, giving no deference to the trial court's determination." *Price v. Armour*, 949 P.2d 1251, 1254 (Utah 1997).

ANALYSIS

I. The Juvenile Court Correctly Deferred to the BIA's
Construction of the Phrase "Qualified Expert Witness" as Used
in ICWA.

A.     ICWA and the BIA

¶10     In a custody proceeding involving an Indian child, a state
court must comply with ICWA.[2] That statute, passed in 1978,

---

2. In general, the promulgation of child welfare procedures is a
matter reserved to the states. *See Elk Grove Unified School Dist. v.
Newdow*, 542 U.S. 1, 12 (2004) ("The whole subject of the
domestic relations of husband and wife, parent and child,
belongs to the laws of the States and not to the laws of the
United States." (quotation simplified)), *abrogated on other grounds
by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.
118 (2014). While the mandates of ICWA are based on the federal
government's "plenary power over Indian affairs," 25 U.S.C.
§ 1901(1) (2012), ICWA clearly contemplates that state courts will
adjudicate child custody cases involving Indian children, *see id.*
§ 1911. So long as the core intent of ICWA is preserved—
providing procedural and substantive protections such as the
right to counsel, notice to the tribes, rehabilitative services, a
procedure to invalidate illegal proceedings, and imposing high
standards of proof—the underlying procedural framework for
child custody cases has been left to the states, even in cases
involving Indian children. *See In re adoption of A.B.*, 2010 UT 55,
¶ 32, 245 P.3d 711; *In re C.D.*, 2008 UT App 477, ¶ 14, 200 P.3d
194. The Utah Supreme Court has determined that in passing
ICWA, Congress did not intend to preempt state child welfare
law, *In re adoption of A.B.*, 2010 UT 55, ¶ 30, but ICWA does
provide that "[i]n any case where State or Federal law applicable
to a child custody proceeding . . . provides a higher standard of

(continued…)

reflects a national purpose "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902 (2012); *see also In re adoption of A.B.*, 2010 UT 55, ¶¶ 32, 36, 245 P.3d 711. The act seeks to accomplish this purpose by imposing "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902; *see also In re adoption of A.B.*, 2010 UT 55, ¶ 36. In passing ICWA, Congress wanted to ensure that Indian child-welfare determinations were not based on "a white, middle-class standard which, in many cases, forecloses placement with an Indian family." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (1989) (quotation simplified) (citing H.R. Rep. No. 95-1386, at 24 (1978)). Congress recognized "that state law was inappropriately addressing the removal and placement of Indian children," *In re C.D.*, 2008 UT App 477, ¶ 14, 200 P.3d 194, by "fail[ing] to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families," 25 U.S.C. § 1901(5) (2012).[3]

---

(…continued)

protection to the rights of the parent . . . of an Indian child than the rights provided under this subchapter, the State . . . shall apply the [higher] standard," 25 U.S.C. § 1921 (2012). This is to ensure "that parents of Indian children enjoy the highest level of protection of their parental rights available." *In re adoption of B.B.*, 2017 UT 59, ¶ 67, 417 P.3d 1; *see also* 25 U.S.C. § 1921.

3. ICWA is clearly concerned with the best interests of the "Indian child," but the phrase "best interests of Indian children" in the context of ICWA is necessarily more involved than the general "best interests of the child" standard applicable in child welfare cases involving non-Indian children. Under any analysis,

(continued…)

¶11 As part of its efforts to advance these interests, ICWA requires that any foster care placement of an Indian child be "supported by clear and convincing evidence, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." *Id.* § 1912(e) (emphasis added). But the phrase "qualified expert witness" is not defined by ICWA, and when the juvenile court was asked to examine the provision, it found it to be ambiguous. The juvenile court therefore looked to the BIA—the executive agency tasked with promulgating rules and regulations to carry out ICWA's provisions, *id.* § 1952; *see infra* note 4—for guidance. The BIA's 2016 Regulations define "qualified expert witness" as follows: "a qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." 25 C.F.R. § 23.122(a) (2016); *see also* Indian Child Welfare Act Proceedings Final Rule (Final Rule), 81 Fed. Reg. 38,777, 38,829 (June 14, 2016) ("The qualified expert witness should have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe . . . . The question of whether the continued custody of the child by the parent or Indian custodian is likely to result in

_____

(…continued)

a child's physical and emotional health must be paramount. But under ICWA, there is an additional presumption that it is in the best interests of the "Indian child" to maintain ties with the Indian tribe, Indian culture, and Indian family. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 50 n.24 (1989) ("[ICWA] is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected." (quotation simplified)).

serious emotional or physical damage to the child is one that should be examined in the context of the prevailing cultural and social standards of the Indian child's Tribe."); 1979 Guidelines, 44 Fed. Reg. 67,584, 67,593 (Nov. 26, 1979) (explaining that "knowledge of tribal culture and childrearing practices will frequently be very valuable to the court" in determining the likely impact of parental custody under the standards of ICWA because "[s]pecific behavior patterns will often need to be placed in the context of the total culture to determine whether they are likely to cause serious emotional harm"). We now turn to the question of whether the juvenile court correctly deferred to the BIA regulation to determine whether the GAL's witnesses qualified as experts pursuant to ICWA.

B. In Interpreting Ambiguous Provisions of a Federal Statute, We Are Bound by the *Chevron* Deference Doctrine.

¶12 When interpreting a statute, a court's "primary goal is to evince the true intent and purpose" of the legislative body. *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (quotation simplified). The best evidence of legislative intent is "the plain and ordinary meaning of the statute's terms." *Rent-A-Center West, Inc. v. Utah State Tax Comm'n*, 2016 UT 1, ¶ 13, 367 P.3d 989. A statute draws its meaning from its text, but when a genuine ambiguity appears, it is usually up to the courts to resolve the ambiguity by "resort[ing] to other modes of statutory construction," such as "seek[ing] guidance from legislative history and other accepted sources" or employing "unique rules" to "guide our construction of ambiguous terms" in "specific contexts." *Marion*, 2011 UT 50, ¶ 15 (quotation simplified).

¶13 One of these unique rules requires courts to grant deference to a federal administrative agency's interpretation of a federal statute when it appears that Congress has left "gaps" in

the legislation for the agency to fill. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). "The court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Federal Nat'l Mortgage Ass'n v. Sundquist* (*Sundquist I*), 2013 UT 45, ¶ 19, 311 P.3d 1004 (quotation simplified); *see also Bank of Am., NA v. Sundquist* (*Sundquist II*), 2018 UT 58, ¶¶ 23–24, 430 P.3d 623. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *see also Sundquist II*, 2018 UT 58, ¶ 45. That is, although the judiciary is the final authority on issues of statutory construction, if a federal statute is not clear, our courts "have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron*, 467 U.S. at 844; *Sundquist II*, 2018 UT 58, ¶ 24. This principle is commonly known as the *Chevron* deference doctrine.

¶14    To the juvenile court below and on appeal in this court, the GAL argued that our supreme court had repudiated any of its prior precedent that supports deference to a federal administrative agency's interpretation of a federal statute pursuant to the *Chevron* deference doctrine. *See Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12 n.13, 416 P.3d 389; *Ellis-Hall Consultants v. Public Service Comm'n*, 2016 UT 34, ¶ 33, 379 P.3d 1270; *Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 25, 322 P.3d 712; *Sundquist I*, 2013 UT 45, ¶ 40; *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 29, 308 P.3d 461. However, while this case was pending on appeal, the Utah Supreme Court issued a decision in *Sundquist II*, 2018 UT 58, wherein the court overruled its 2013 decision in *Sundquist I* and held that while the court has declined to employ *Chevron*-like

deference when reviewing a state agency's interpretation of a state statute or regulation, or a state agency's interpretation of a federal statute, *see Hughes Gen. Contractors*, 2014 UT 3, ¶ 25, our courts must still defer to a *federal* administrative agency's interpretation of an ambiguous *federal* statute. *See Sundquist II*, 2018 UT 58, ¶¶ 21–24. Therefore, because the BIA is a federal administrative agency and ICWA is a federal statute, we must employ the principles articulated in *Chevron* to determine whether the BIA's 2016 regulation defining "qualified expert witness" is entitled to deference.

C.      The BIA's Definition of the Term "Qualified Expert Witness" Is Entitled to *Chevron* Deference.

¶15     When a federal agency's interpretation of a federal statute "places us in the shadow of *Chevron*," we must "pass through a series of analytical gates." *Id.* ¶¶ 21–22. First, we must determine whether the provision is ambiguous. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If we determine that "the statute is silent or ambiguous with respect to the specific issue," *Sundquist II*, 2018 UT 58, ¶ 45 (quotation simplified), then we must consider "whether Congress intended to delegate authority to the [agency] to weigh in on the issue," *id.* ¶ 22, and, if so, whether the agency's interpretation "is based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843. If we determine that the agency has authority and that its construction is reasonable, then the agency's interpretation is entitled to deference. *See id.* at 843–45.

1.      The Term "Qualified Expert Witness" as Used in ICWA Is Ambiguous.

¶16     ICWA does not define the term "qualified expert witness." While "expert witness" is a standard term that is

defined by reference to state and federal law, the word "qualified" is not so easily defined. The use of the extra word "qualified" in the statute indicates that Congress intended to give that word separate meaning and to require that an "expert" be possessed of an extra set of qualifications beyond traditional expertise. But ICWA is silent as to what those qualifications are. Because the statute does not unambiguously address the question, we must "rely on other tools of statutory interpretation," *see Sundquist II*, 2018 UT 58, ¶ 37, beginning with an examination of the BIA's interpretation.

2.      Congress Has Granted the BIA the Authority to Interpret ICWA.

¶17    When ICWA was enacted, the statute instructed the Department of the Interior as follows: "Within one hundred and eighty days after November 8, 1978, the Secretary shall promulgate such rules and regulations as may be necessary to carry out the provisions of this chapter." 25 U.S.C. § 1952 (2012). This express grant of rulemaking authority gives the BIA broad discretion to interpret and implement ICWA.[4] The BIA's

---

4. Immediately following the passage of ICWA, in 1979, the BIA issued guidelines representing the BIA's interpretation of ICWA and providing procedures designed to "help assure that rights guaranteed by [ICWA] are protected when state courts decide Indian child custody matters," Guidelines for State Courts in Indian Child Custody Proceedings (1979 Guidelines), 44 Fed. Reg. 67,584 (Nov. 26, 1979). In the course of the notice-and-comment period for the 1979 Guidelines, "[s]everal commenters remarked . . . that the Department [of the Interior] had the authority to issue regulations and should do so." Final Rule, 81 Fed. Reg. 38,777, 38,784 (June 14, 2016). Nevertheless, "[t]he Department declined to issue regulations" at that time, *id.*, and made it clear in its introduction to the 1979 Guidelines that they

(continued…)

(…continued)

were not intended to have binding legislative effect and were issued primarily to assist state courts in their implementation of ICWA, *see* 1979 Guidelines, 44 Fed. Reg. at 67,584. The BIA explained that while "[p]ortions of [ICWA] do expressly delegate to the Secretary of the Interior responsibility for interpreting statutory language[,] . . . [p]rimary responsibility for interpreting other language used in the Act . . . rests with the courts that decide Indian child custody cases." *Id.*

In 2015, because of inconsistent implementation and interpretation of ICWA among the states and the fact that Indian children were still found in child-welfare proceedings at twice the rate of the general population, the BIA determined that it would be appropriate and necessary to promulgate additional and updated guidelines interpreting ICWA and provide uniform standards for state courts. *See generally* Jason R. Williams et al., Casey Family Programs, Indian Child Welfare Act: Measuring Compliance (2015), http://www.casey.org/media/measuring-compliance-icwa.pdf [https://perma.cc/93J8-DADU]. Accordingly, the BIA updated its guidelines and explained that the new 2015 Guidelines were intended to "promote compliance with ICWA's stated goals and provisions by providing a framework for State courts and child welfare agencies to follow." Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146–47 (Feb. 25, 2015).

Again, in the course of the notice-and-comment period, "[m]any commenters on the 2015 Guidelines requested not only that the Department update its ICWA guidelines but that the Department also issue binding regulations addressing the requirements and standards that ICWA provides for State-court child-custody proceedings." Final Rule, 81 Fed. Reg. at 38,784. In response to this commentary, the BIA "began a notice-and-

(continued…)

(…continued)

comment process to promulgate formal ICWA regulations." *Id.*; *see also* Regulations for State Courts and Agencies in Indian Child Custody Proceedings (Proposed Regulations), 80 Fed. Reg. 14,880 (March 30, 2015).

A final rule promulgating binding regulations was issued by the BIA in 2016, along with a new set of nonbinding guidelines to replace both the 1979 and 2015 Guidelines. *See* Final Rule, 81 Fed. Reg. 38,777; U.S. Dep't of Interior, Office of the Assistant Secretary-Indian Affairs, Bureau of Indian Affairs, *Guidelines for Implementing the Indian Child Welfare Act*, 4–6 (2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-05 6831.pdf [https://perma.cc/9KUE-23QU]. In its introduction to the 2016 Regulations, the BIA repudiated the opinion expressed in its 1979 Guidelines suggesting that it lacked the authority to promulgate binding regulations. *See* Final Rule, 81 Fed. Reg. at 38,786. The BIA observed that the jurisprudence that has developed in the intervening years since the 1979 Guidelines were issued, both with respect to ICWA specifically and to the authority of federal agencies generally, indicates that Congress intended to grant the BIA authority to issue binding regulations interpreting ICWA. For example, in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1989), the Supreme Court considered whether Congress intended the definition of "domicile" to be left to the interpretation of individual states or whether it should be interpreted uniformly. *See id.* at 43. The Court concluded that Congress intended ICWA to have "nationwide uniformity" with respect to the definition of "critical term[s]." *Id.* at 44–45. Relying on this jurisprudence, the BIA concluded that Congress intended to grant it the authority to promulgate binding regulations to ensure uniform interpretation and application of important ICWA provisions. *See* Final Rule, 81 Fed. Reg. at 38,787–88. The BIA also observed

(continued…)

(…continued)

that "grants of rulemaking authority" similar to that granted to the Department of the Interior by section 1952 of ICWA "have been held to presumptively authorize agencies to issue rules and regulations addressing matters covered by the statute unless there is clear congressional intent to withhold authority in a particular area." Final Rule, 81 Fed. Reg. at 38,785. Relying on such cases, the BIA concluded that ICWA's "grant of rulemaking authority is broad and inclusive," encompassing the authority to issue binding regulations. *Id.*

An agency's assessment of its own rulemaking authority is not binding. *See United States v. Haggar Apparel Co.*, 526 U.S. 380, 387–89 (1999) (determining that the Customs Service's statement that it considered its regulatory authority to be limited "does not suffice to displace the usual rule of *Chevron* deference" and that the agency's use of the notice-and-comment process, in conjunction with a broad grant of authority to the Secretary of the Treasury to "establish and promulgate" necessary "rules and regulations," demanded judicial deference absent express language limiting the Customs Service's authority (quotation simplified)). Nevertheless, the BIA's careful examination of its authority under ICWA is persuasive. ICWA's express instruction that "the Secretary *shall* promulgate such rules and regulations as may be necessary to carry out the provisions of this chapter," 25 U.S.C. § 1952 (emphasis added), is similar to other grants of rulemaking authority that have been afforded *Chevron* deference, *see City of Arlington v. FCC*, 569 U.S. 290, 306 (2013) (observing the absence of "a single case in which a general conferral of rulemaking or adjudicative authority has been held insufficient to support *Chevron* deference for an exercise of that authority within the agency's substantive field"); *see also National Cable & Telecomms. Ass'n v. Brand X Internet Services*, 545 U.S. 967, 980–81 (2005) (explaining that where an agency issues a regulation

(continued…)

definition of "qualified expert witness" was promulgated in accordance with the rulemaking power granted to it by ICWA, *see* 25 U.S.C. § 1952, and "the agency utilized the notice-and-comment rulemaking process before issuing the regulations," *see United States v. Haggar Apparel Co.*, 526 U.S. 380, 390 (1999); *see also United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (stating that notice-and-comment rulemaking is an indicator of authority entitled to *Chevron* deference). *See generally* Proposed Regulations, 80 Fed. Reg. 14,880 (March 20, 2015). Thus, it is apparent that the BIA's regulation defining "qualified expert witness" fell within the scope of its congressionally granted authority.

3.    The BIA's Definition of "Qualified Expert Witness" Is a Permissible Construction of That Term.

¶18    Finally, we must decide whether the juvenile court correctly determined that the BIA's definition of "qualified

---

(…continued)

"in the exercise of [its] authority" to "promulgate binding legal rules," there is "no . . . question[]" that the regulation is within the agency's jurisdiction and it is therefore entitled to *Chevron* deference); *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (explaining that "express congressional authorization[] to engage in the process of rulemaking or adjudication that produces regulations or rulings" is "a very good indicator of delegation meriting *Chevron* treatment"). Further, the need for binding regulations is apparent in light of ICWA's purpose to resolve the historical problem of states failing "to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5). Thus, we agree with the BIA that, in spite of its 1979 indication to the contrary, it has the authority to promulgate binding regulations interpreting ICWA.

expert witness" is a permissible construction of ICWA. The regulation states that a "qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." 25 C.F.R. § 23.122(a) (2016). Determining that a "qualified expert witness" "should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe" is consistent with Congressional intent and is reasonable. The purpose of promulgating ICWA in the first place is stated in the statute: "States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C § 1901(5). Consequently, "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them." *Id.* § 1901(4). The BIA's determination that a qualified expert should be prepared to testify regarding the prevailing social and cultural standards of the relevant Tribe certainly helps ensure that Indian children will not be removed from their homes based on "a white, middle-class standard." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (1989) (quotation simplified).

¶19 In addition, defining "qualified expert witness" as a witness capable of testifying about the relevant Tribe's social and cultural standards seems entirely reasonable. A state court's traditional custody concerns regarding serious emotional or physical damage to the child may be different in the context of an Indian family. "In many ICWA cases, expert testimony may be necessary to educate a court about tribal customs and childrearing practices to diminish any risk of cultural bias." *Steven H. v. Arizona Dep't of Econ. Sec.*, 190 P.3d 180, 185 (Ariz. 2008) (en banc); *see also Marcia V. v. State*, 201 P.3d 496, 504 (Alaska 2009) ("Congress intended ICWA to prevent Native

children from being separated from their families solely on the basis of testimony from social workers who were unable to distinguish between cultural variations in child-rearing practices and actual abuse or neglect." (quotation simplified)). Accordingly, it is not unreasonable to require expert testimony presented to a court to reflect and be informed by the cultural and social standards of the relevant Indian tribe. Because the BIA's definition is reasonable, it is entitled to deference under *Chevron*. *See Chevron*, 467 U.S. at 843–45. Thus the juvenile court did not err in determining that the regulation was binding.

## II. The Juvenile Court Misapplied the BIA's Regulation in Considering the GAL's Motion to Transfer Custody and Exceeded Its Discretion When It Excluded the GAL's Witnesses Without Considering Their Qualifications.

¶20 While the juvenile court was right to defer to the BIA's definition of "qualified expert witness" contained in the federal regulation, the court erred in summarily denying the GAL's motion to transfer custody of Child purely on the basis that the GAL did not produce a witness who could testify about the prevailing social and cultural standards of Child's Tribe.

¶21 The BIA's definition contained in the 2016 Regulations states that while a "qualified expert witness *must be* qualified to testify regarding whether the child's continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child," the witness "*should be* qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." 25 C.F.R. § 23.122(a) (2016) (emphases added). The second part of the definition, pertaining to the witness's qualification to testify regarding tribal social and cultural standards, uses the phrase "should be" rather than "must be." It therefore grants state courts discretion to determine whether this type of qualification is "necessary in any particular case." *See* Final Rule, 81 Fed. Reg. 38,777, 38,830 (June 14, 2016). In issuing

the 2016 Regulations, the BIA explained its intent in making this portion of the regulation discretionary:

> The final rule does not . . . strictly limit who may serve as a qualified expert witness to only those individuals who have particular Tribal social and cultural knowledge. The Department recognizes that there may be certain circumstances where a qualified expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe in order to meet the statutory standard. For example, a leading expert on issues regarding sexual abuse of children may not need to know about specific Tribal social and cultural standards in order to testify as a qualified expert witness regarding whether return of a child to a parent who has a history of sexually abusing the child is likely to result in serious emotional or physical damage to the child. Thus, while a qualified expert witness should normally be required to have knowledge of Tribal social and cultural standards, that may not be necessary if such knowledge is plainly irrelevant to the particular circumstances at issue in the proceeding.

*Id.* at 38,829–30 (citation omitted). This approach is consistent with the body of case law that developed on this issue prior to the enactment of the 2016 Regulations. *See, e.g.*, *Rachelle S. v. Arizona Dep't of Econ. Sec.*, 958 P.2d 459, 461–62 (Ariz. Ct. App. 1998) (collecting cases).

¶22 Thus, while it will generally be important for a qualified expert witness to have knowledge of tribal social and cultural standards, such specialized knowledge may not be necessary if tribal cultural standards are plainly irrelevant to the particular

circumstances at issue. "In such a situation, a professional person with substantial education and experience in the area of his or her specialty may be a qualified expert witness, depending upon the basis urged for removal." *Steven H. v. Arizona Dep't of Econ. Sec.*, 190 P.3d 180, 185 (Ariz. 2008) (en banc) (quotation simplified); *see also, e.g.*, *In re Candace A.*, 332 P.3d 578, 584 (Alaska 2014) ("When the basis for termination is unrelated to [Indian] culture and society and when any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding, the qualifications of an expert testifying under ICWA § 1912(f) need not include familiarity with [Indian] culture." (quotation simplified)); *Rachelle S.*, 958 P.2d at 461–62 (holding that a medical expert on "shaken-baby syndrome" who lacked specialized knowledge of Indian culture satisfied ICWA's criteria for expert testimony when the Indian parents were accused of child abuse).

¶23   The juvenile court determined that the GAL's witnesses were not qualified as expert witnesses under ICWA solely because they lacked expertise in and could not testify about the Tribe's culture. However, the GAL's purported basis for moving to remove Child from Mother's care may not have been influenced by cultural bias. Rather, the GAL sought removal based on the potential risk to Child arising from Mother's continued relationship with the person who had been convicted of abusing Child's older siblings. This may well be the type of situation that prompted the BIA to give discretion to state courts to determine the necessity of qualified expert testimony regarding tribal cultural standards in each particular case. Thus, the juvenile court erred in dismissing the case without considering whether this was the sort of case in which the claimed reasons for removal were unrelated to tribal customs and culture. Accordingly, we reverse the court's exclusion of the GAL's witnesses and remand for further proceedings, in which

the juvenile court should assess whether the GAL's expert witnesses should be allowed to testify.

## III. The Juvenile Court Erred in Determining That Two of the Therapists Could Be Precluded from Testifying by Therapist–Patient Privilege.

¶24 The GAL also challenges the juvenile court's determination that Mother's communications with her individual therapist and the family therapist were privileged pursuant to rule 506 of the Utah Rules of Evidence.[5] The GAL

---

5. The juvenile court's ruling on this issue is curious. The June 27, 2017 minute order states, "Court finds Mother would have privilege with [Mother's therapist] and [family therapist] according to Objection 506." However, the discussion of the therapist–patient privilege at the hearing appears to have been overshadowed by the ICWA issue. Regarding privilege with respect to Mother's therapist, the court stated, almost conversationally mid-discussion, "All right, so mom would have a privilege according to rule 506 for at least [Mother's therapist]." The court then heard additional argument regarding the privilege before concluding, "I think it's clear that there may be at least some testimony from some of the counselors . . . if it is relevant testimony. I guess, the hurdle we would need to get over before that, is to determine whether they are, or whether we have a qualified expert witness pursuant to ICWA . . . ." So from the oral ruling, the court seems to have neglected the issue of privilege due to its ultimate determination that the therapists were not qualified experts under ICWA. Yet the court's written minute order states that the privilege existed. Given that the juvenile court appears to have focused less on this issue in its order than the expert witness issues, it is possible that further briefing and/or argument relevant to the asserted privilege may be appropriate on remand.

asserts that the testimony was not privileged, because the therapy was court-ordered and intended to address Mother's parenting deficits that were directly at issue in the proceedings, and because Mother waived any claim of privilege by failing to object to the therapists' letters at previous hearings. Appellees do not dispute this assertion on appeal but maintain that any error was harmless because the therapists were ultimately not qualified as experts under ICWA. Because we have determined that the juvenile court erred in rejecting, pursuant to ICWA, the testimony of the GAL's proposed expert witnesses, Appellees' harmlessness assertion is without merit.

¶25   Moreover, we agree with the GAL that the testimony of the therapists was not subject to therapist–patient privilege. Under rule 506(d) of the Utah Rules of Evidence, communications that are "relevant to an issue of the physical, mental, or emotional condition of the patient . . . in any proceedings in which any party relies upon the condition as an element of the claim or defense" are not subject to therapist–patient privilege. Utah R. Evid. 506(d). The therapy at issue here was court-ordered for the purpose of addressing the concerns that brought Child and her siblings under the jurisdiction of the court. Mother's ability to safely parent Child was directly at issue in the hearing on the GAL's motion for removal and was the subject of the therapists' testimonies. Thus, we can see no basis for concluding that the testimony of the therapists was subject to therapist–patient privilege, and Appellees have pointed us to none.

¶26   Further, as the GAL has pointed out, when a patient "is in the position to claim the privilege and does not, it is waived." *State v. Anderson*, 972 P.2d 86, 90 (Utah Ct. App. 1998) (quotation simplified). The therapists' letters were disclosed at two hearings prior to the hearing on the GAL's motion to remove Child from Mother's custody. Because Mother failed to object to the disclosures when they were first made, she waived her right to

do so at the subsequent hearing. Accordingly, we reverse the court's determination that Mother could assert therapist–patient privilege to exclude the testimony of Mother's therapist and the family therapist.

CONCLUSION

¶27 Although the juvenile court correctly applied *Chevron* deference to the BIA's interpretation of ICWA, it did not correctly apply the regulation, because it rejected the GAL's experts solely on the ground that they were not qualified to testify regarding the Tribe's cultural standards without considering whether those standards had any actual bearing on the proposed grounds for removal. Further, the juvenile court erred in determining that Mother could claim therapist–patient privilege with respect to testimony from her therapist and the family therapist. We therefore reverse the juvenile court's decision and remand for further proceedings consistent with this opinion.

_____